UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FREDD ATKINS, MICHAEL
WHITE, and MARY MACK,

Plaintiffs

v.                                                    No. 8:19-cv-3048-T-02CPT

SARASOTA COUNTY, FLORIDA,

Defendant
_____/


ORDER GRANTING SUMMARY JUDGMENT

Several reasons have been suggested for the 2019 Sarasota County

Commission redistricting, including:  sincere equalizing of unbalanced districts, or

furthering Republican party control, or protecting developer interests, or pure

incumbent protection, or reaction to abolishment of at-large voting, or race.  For

Plaintiffs to prevail under the controlling law, race must not only have been _a_

motive, it must have been _the  predominant motive_.  There is no genuine issue of

fact in this record – race was not the predominant motive for this redistricting.  For

this reason the Court grants summary judgment to the County in this case.

A.  HISTORY OF THE COMMISSION DISTRICTS:

This diagram shows Sarasota County's 556 square miles[1] in area, with the five predecessor districts on the left, and the redrawn, challenged districts on the right. (Doc. 65-1 at 21, 65-2 at 91).  The small box in both maps is the approximately one-square mile[2] neighborhood in the City of Sarasota known as Newtown, which is the focus of this dispute.  Newtown is less than .002 of the land area of Sarasota County.  Plaintiffs contend that the redistricting which included Newtown into new District 2 violates the Equal Protection Clause of the Fourteenth Amendment.



Until late 2018, Sarasota County elected all commissioners on an at-large basis, countywide.  In other words, although a commissioner was resident in his or her

---

[1]Census.gov/quickfacts/table.sarasotacountyflorida,US/LND110210, last consulted 4/27/2020.  Both U.S. census data and geographic maps which are generally available and not in contest may be judicially noticed.  Fed. R. Evid. 201(b); *Moore v. Comfed Sav. Bank,* 908 F.2d 834, 841 n. 4 (11th Cir. 1990).
[2]UniversalMAP, Sarasota & Bradenton Florida StreetMap; google.com/maps/place/Sarasota,=FL/, last consulted 4/27/2020.

numbered district, the county-wide electorate at large voted on each district's commissioner.   That changed in late 2018.  A county referendum ended at-large voting and imposed district-only elections to begin in 2020. Doc. 65 par. 1; Doc. 65-1; Doc. 65-2 at 91.   Starting in 2020, only residents of the single district will vote for their commissioner.

Florida law requires Sarasota County to have a five-member board of county commissioners, with staggered elections.[3]  Under staggered elections in Sarasota County, historically, the odd-numbered districts vote in presidential-election years and even-numbered districts vote in non-presidential election years.  In 2020, Districts 1, 3, and 5 will vote while 40% of the county (the even-numbered districts) will choose their commissioners in 2022.  Doc. 77-34 at 111.  Each commissioner must reside in his or her district.[4]

The elimination of at-large voting and move to single-district voting caused the County Commission to consider redistricting in 2019, *id.* at 19*,* and Florida statutes require County redistricting to equalize population "from time to time" in odd-numbered years. Fla Stats. 124.01(3). The proponents of redistricting suggested the five districts may be insufficiently equal in population due to growth in the county since the last redistricting in 2011.  Opponents of redistricting pointed out that the

---

[3] Fla. Const. Art. VIII, sec. 1(e); Fla. Stats. 124.01.
[4] *See* County Charter, Doc. 77-2 at 8.

national census would soon occur and would likely require redistricting anew. Opponents cited the expense of redistricting so close to the census as well as potential litigation; some opponents suggested pure political and also racial reasons for this undertaking.

The County Attorney and County Administration advised hiring a consultant to undertake this effort, Doc. 77-15 at 73, which was done.  The consultant produced three maps for consideration, and five additional maps were offered by the public.

One of these maps was offered anonymously by "Adam Smith," a person later identified as a Republican political operative.  At the direction of the Board, that map was corrected by the consultant to equalize districts.  Doc. 77-25 at 138 – 139. On  November 19, 2019, after prior notice and advertising, the Board first voted on a map originating from the consultant, and voted it down.  The Board then adopted the corrected "Adam Smith" map by a vote of 3 – 2.   Doc. 77-25 at 215.   The resulting districts are shown, above.

B.  PROCEEDINGS IN THIS LAWSUIT:

Plaintiffs filed suit in December 19, 2019 and filed the operative Amended Complaint January 9, 2020.  Doc. 9.  Plaintiff Atkins is the first elected African American to serve on the City of Sarasota Board of Commissioners, and he is the former three-term mayor of Sarasota.  He resides in former District 1 and ran

unsuccessfully for District 1 County Commissioner in 2016 against present incumbent Moran.  The Amended Complaint notes Mr. Atkins is presently a candidate to run again in District 1 for the Board of County Commissioners in 2020.  He asserts that the redistricting has abridged his right to vote in 2020 in the County Commission election on the basis of race or color.  Plaintiffs White and Mack are both residents of Sarasota County who assert that their rights to vote in the 2020 County Commission election have been abridged on the basis of race or color.  Doc. 9 at 3.

The Amended Complaint alleges that Newtown is an African-American community of long standing, bordered by Highway 301 to the east, Bradenton Road to the west, Myrtle Street to the north, and 17th Street to the south.  Newtown was in District 1.  Doc. 9 at 5 – 6.  The complaint alleges: passage of district-only voting created something "the existing Commissioners and their money patrons feared."  "With single-district voting, Newtown would have a real opportunity to elect a county commissioner who was either African-American or who was responsive to the needs and priorities of the Newtown African-American community in District 1.  Indeed, absent countywide voting, Plaintiff Atkins would have been elected District 1 Commissioner in 2016 [because he won that District in 2016 but not countywide]."  Doc. 9 at 6 – 7.

The new, redrawn districts "removed Newtown from District 1 and moved it to District 2, whose commissioner seat was not up for reelection until November 2022.  It also removed Plaintiff Atkins from District 1, where he had already declared his candidacy."  Doc. 9 at 10 par. 36.  The Amended Complaint alleges this new map is illegal as "based blatantly upon racial classifications" and "is being maintained in an effort to segregate voters into separate districts on the basis of race" "without sufficient justification."  Doc. 9 at 10 par. 35; Doc. 9 at 14 pars. 54, 56.

The Amended Complaint asserted three counts, but only Count 1 remains before the Court.[5]  Count 1 seeks relief under the equal protection clause of the Fourteenth Amendment to the U.S. Constitution.  It notes that "Discrimination based on race in the voting context is a clear violation of the Fourteenth Amendment.  There is no compelling justification or state interest in creating districts along racial lines to limit minority participation in the political process."  Doc. 9 at 14 par. 57.

After filing the Amended Complaint, Plaintiff moved for an expedited scheduling conference.  Doc. 15.  The parties had agreed to expedited discovery

---

[5] On February 4, 2020 the Court dismissed with prejudice Count 3, based upon Fla. Const. section 21. Docs. 26, 27.  Count 2 was dismissed by stipulation of the parties.  Doc. 36.

and a preliminary injunction schedule to permit an April ruling thereon.  Doc. 15 at

3.  With the impending 2020 election, time was of the essence.   Although agreeing

to an expedited procedure, Defendant replied that by June, 2020 "the election

process will be in full swing," Doc. 22 at 1, and candidate petition signatures had

to be submitted by May 11 with a qualifying period of June 8 through June 12.

Doc. 22 at 1, 2.   The Court accommodated the parties' desire for an expedited

proceeding, and they are to be complimented in carrying out this swift, yet

thorough, discovery and case presentation.

## C.  THE LEGAL STANDARDS:

The test is whether the Commission's motive in redrawing the districts "was

predominantly racial, not political.  In making this determination [per Supreme

Court cases] the burden of proof on the plaintiffs (who attack the district) is a

'demanding one.'"  *Easley v. Cromartie,* 532 U.S. 234, 241, 121 S. Ct. 1452, 1458

2001).  As the Supreme Court held, "[r]ace must not simply have been '*a*

motivation for the drawing of  [the contested] district'…but 'the *predominant*

*factor'* motivating the legislature's districting decision."  *Id.* (emphasis in

original)(citations omitted).   As Justice Breyer wrote for the *Cromartie* Court,

"[p]laintiffs must show that a facially neutral law 'is unexplainable on grounds

other than race.'" *Id.* at 242 – 243, 121 S. Ct. at 1458 (citing cases).  The racial

motive must be "dominant and controlling."  *Id.* at 257, 121 S. Ct. at 1466.

7

In other words, Plaintiffs must "disentangle race from politics and prove that the former drove a district's lines." *Cooper v. Harris,* 137 S. Ct. 1455, 1473 (2017).   Beyond this "demanding" burden, Plaintiffs face a Supreme Court-mandated presumption that districts were drawn in good legislative faith.   *Miller v. Johnson,* 525 U.S. 900, 915 - 916, 115 S.Ct. 2475, 2488 (1995)(courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race").   Indeed, Justice Breyer's majority opinion in *Cromartie* added italics to the admonition  for *"extraordinary caution,"*  532 U.S. at 242, 121 S.Ct. 1458, and then repeated the admonition twice.   532 U.S. at 257, 121 S.Ct. at 1466.   This extraordinary caution is required because "[f]ederal court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller, supra,* 525 U.S. at 915, 115 S. Ct. at 2488.

The Supreme Court has stated the basic question:   "The basic question is whether the legislature drew [the] boundaries because of race *rather than* because of political behavior (coupled with traditional nonracial districting considerations)." *Cromartie, supra,* 532 U.S. at 257, 121 S.Ct. at 1466 (emphasis in original).   If the answer to this basic question is "yes," then the Court must apply a stringent "strict scrutiny" test because racial classifications are presumptively invalid.   *Shaw v. Reno,* 509 U.S. 630, 642 – 645, 113 S. Ct. 2816, 2825 (1993).

The Supreme Court in *Miller* noted that Rule 56's summary judgment procedures are one process to consider this matter.  525 U.S. at 916 – 917; 115 S.Ct. at 2488.

Adjudicating this question at summary judgment stage under Fed. R. Civ. P. 56(a) requires inquiry into whether "the movant shows that there is no genuine dispute as to any material fact and the  movant is entitled to judgment as a matter of law."  *Id.*  If the movant points out the absence of evidence to support an essential, material element of non-movant's case, then the non-movant must "make a showing sufficient to establish the existence of [this] element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554 (1986).  Although the evidence must be viewed in a light favorable to the non-movant, to avoid summary judgment the non-movant must cite "significantly probative evidence" that "demonstrates a genuine dispute of material fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 – 250, 106 S.Ct. 2506, 2511 (1986).  "Colorable evidence," *id.,* or a scintilla, will not do.  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### D.  FACTUAL RECITATION:

To ensure equal representation, i.e. "one person, one vote," districts should be equal in population.  *See generally, Reynolds v. Sims,* 377 U.S. 533, 579, 84 S.Ct.

1362, 1391 – 1392 (1964).  This is also required by Florida statutes.  Fla. Stats. 124.01(3).  Absolute mathematical equivalence is often not possible in the real world.  The presumptive (not legal) general rule of thumb is that districts are out of alignment, and should be repopulated, if they vary more than ten percentage points in population from each other, centered around the required mean.[6]  Doc. 77-25 at 35; Doc. 77-20 at 77 - 78.  *See Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696 (1983).   Preliminary population estimates reviewed by county staff in 2019, which staff stated were "preliminary," Doc. 77-25 at 108, showed districts to vary just inside that ten percent guideline.  Doc. 77-25 at 37, 49; Doc. 77-17 at 2.

The County Attorney and County Administrator informed the Board that mid-decade redistricting was permissible, and suggested to the Board that it hire a consultant to assist in considering redistricting.  Doc. 77-7 at 4 - 6; Doc. 77-15 at 73.   The consultant that was hired, Kurt Spitzer, was a qualified advisor from Tallahassee who had assisted counties and cities in approximately 16 prior redistrictings.  Doc. 77-25 at 105 – 106, 125; Doc. 77-21 at 154.  Spitzer,  using a demographer as sub-consultant, found initial deviations of roughly  12 percentage points  between some of the districts and later found slightly over 13 percentage

---

[6] By way of example:  If the County has 5000 residents and five districts, each district ought to have 1000  residents, the mean.  If one district has 1060 residents and another district has 950 residents, they are in violation of this very rough rule of thumb.  For a discussion of this in the record, *see* Doc. 77 at 8 par. 33.

points once the data was corrected, suggesting redistricting was indicated.  Doc. 77-20 at 87 – 89, 149 – 150; Doc. 77-33 at 14 – 18.

Spitzer, the retained consultant on the job, was a consultant with experience working with the Florida Association of Counties, and a masters degree in public administration from Florida State University.  Doc. 65-2 at 153; *see also* Doc. 77-25 at 124 - 125.   He had consulted on about 16 different city or county redistrictings.  *Id.;* Doc. 77-34 at 92 - 93.  Spitzer testified that he was not given specific instruction from the County as to specific political result, other than to following common redistricting principles.  He testified no one at the county told him where to draw specific lines.  Doc. 65-2 at 168, 180; Doc. 77-20 at 8.  He was not instructed as to what he should or should not do in drawing boundaries, other than those statements made to him during recorded Board meetings and conference calls.  Doc. 65-2 at 168 – 170.  Spitzer testified no one mentioned Newtown or Fredd Atkins to Spitzer or talked about candidates who might be running.  Spitzer testified no one discussed partisan or political considerations with him.  *Id.* at 169 – 170.  Spitzer testified there was not a hint or wink or anything about race suggested to him.  *Id.;* Doc. 77-20 at 49; Doc. 77-21 at 135.    The County Attorney told him not to consider party affiliation and Spitzer testified he did not.  He is unfamiliar with Sarasota County politics.  *Id.* at 196 – 197; Doc. 77-21 at 100.

Spitzer testified he thought the Board's level of activity in this process was very low compared to other projects he had been involved in, and the Board did not take a hands on approach in drawing the maps he submitted.  *Id.* at 196.  He testified "we were not asked to look at Newtown" and the only time he did was late in the process when someone suggested erroneously at a public hearing that a proposed map split Newtown.  *Id.* at 194.  Twice during his deposition Spitzer expressed ignorance about where Newtown was on the map.  Doc. 77-21 at 100 – 103, 131.

Spitzer's assisting demographer, Richard Doty, was qualified with a masters degree in urban/regional planning and a specialization in geographic information systems.  Doc. 77-2 at 90 - 91.    He was part of the agency, the University of Florida's Bureau of Economic and Business Research,  that advised the State of Florida on demographics.  Doty's agency provides under contract the population estimates to the State, all counties, and 412 municipalities.  Doc. 77-22 at 7 - 10. Doty had a strong background in demographics and is one of the top demographers in the State.  Doc. 77-2 at 90 - 97.  According to the Amended Complaint, Doty is one of the two persons assigned by the State of Florida to work with the Bureau of Census in the upcoming 2020 census.  Doc. 9 at 8 – 9; Doc. 77-33 at 9 - 10. Doty's agency has a contract with the Florida Legislature. *Id.* at 8 -9 , 11.  As part of his job, in 2018 he had already worked a project providing population estimates for Sarasota County.  Doc. 77-33  at 26 – 29; Doc. 77-2 at 7, 17 - 18.

Doty provided the relevant data for this redistricting and was not involved in drawing redistricting lines or maps.  Doc. 77-22 at 42, 60.  He testified without contradiction that no one from the County, nor Spitzer, dictated or controlled how he did his work.  *Id.* at 89.  He testified that his sole objective was reliable data and his methodology had no objective or relation to race politics, or partisanship.  *Id.* Doty testified race was never suggested to him as relevant to the project.  *Id.* at 146.

Spitzer's main point of contact with the Board was Deputy County Administrator Brad Johnson.  Doc. 77-20 at 32 – 35; Doc. 65-2 at 170 - 171. Johnson was a county employee involved in coordinating or managing the redistricting project for the County, from its outset in April 2019.  Doc. 65-1 at 8. Johnson testified he never met or spoke with the political operative Robert Waechter who submitted the "Adam Smith" map, although Waechter emailed the map to him.  Doc. 77-25 at 13, 17.  According to Johnson, Spitzer's reported data showed that Districts 3 and 5 were overpopulated and District 1, 2, and 4 required more population.  *Id.* at 82.  Johnson testified that no commissioner in meetings with Spitzer asked to participate in drawing maps.  *Id.* at 91.

A county demographer who worked on staff with Johnson was named Tamara Schells.   She assisted in the earlier preliminary county review of the numbers and was involved somewhat throughout the process.  She testified that throughout the

process she did not hear or see anything that led her to believe or indicated to her that racial considerations were the motive for where the district lines were drawn. Doc. 77-15 at 79.

During the past 9 years since the 2010 decennial census, the majority of Sarasota County's growth was in the south County, away from Districts 1 and 2. Fairly early in this redistricting process, County data which was updated through 2018 showed the least populous district to be District 2, suggesting roughly 4000 to 5000 people would have to be added to District 2.  Doc. 77-25 at 108.   The southernmost districts, 3 and 5, were overpopulated.  Doc. 77-25 at 82, 108.

The makeup of the incumbent Commission was as follows:  District 1 was Vice-Chairman Moran, District 2 was Commissioner Ziegler, District 3 was Commissioner Detert, District 4 was Commissioner Maio, and District 5 was Chairman Hines.  Doc. 77-33 at 2.  Any redistricting would have to keep the incumbent commissioners in their own numbered districts, Doc. 65-2 at 178, but neither Maio nor Hines would be running for reelection (even-numbered Maio was departing in 2022 and odd-numbered Hines was going off in 2020).  Doc. 77-33 at 34, 130- 132, 136 - 138; Doc. 77-20 at 42 – 48, 55; Doc. 65-2 at 170 - 171.  Spitzer set forth in a declaration that he assigned district numbers based on incumbency, not by race or reference to Newtown, nor was he asked or directed to assign

numbers by race or reference to Newtown.  Doc. 65-3 at 2 – 3.  Spitzer stated that he recalls no one discussing the numbering of districts with him.  *Id.*

Spitzer presented three potential redistricting maps to the County on September 11, 2019.   Doc. 77-25 at 183.   Neither of these changed the District 2 lines to include Newtown.   The maps were publicized, and five neighborhood meetings held.  Around this time, County Administration also permitted the public at large to submit proposed maps to the County.  Doc. 77-25 at 98.

The three maps originally submitted by Spitzer had to be reworked by Spitzer and Doty because some mathematical flaws were pointed out in them.   Doty testified that due to property appraiser misclassifications, he had to reallocate several dozen census blocks, out of the over 11,000 blocks that were in the County. He testified that 66 blocks out of 11,000 had anomalies that he corrected on the second pass.  He stated that these anomalies were "less than one half of one percent" that "didn't really affect the results in any noticeable way."  He stated he fixed them because it did not look right and "it was an easy fix." Doc 77-22 at 131, 136 – 137.  Spitzer resubmitted his three corrected maps to the County in late October.

In late September, a total of five maps were submitted by the public.  One was submitted anonymously, using the pseudonyms Adam Smith and Agood Citizen.[7] This map was authored by the Republican operative Waechter.  This map redrew the line of District 2 to encompass Newtown.  A second map, upon which Waechter also had input, was submitted by Carolyn Mason,  a former District 1 County Commissioner, an African American and Republican.   This map redrew the District 2 eastern boundary as Tuttle Avenue, which would include the Newtown area into District 2.   Doc. 65-2 at 91; Doc. 77-28 at 2 – 3.  The record shows Spitzer placed these publicly-submitted maps on a template and numbered the districts where the incumbents resided:  Ziegler resided in the northwest with his present home district number, 2.  All five of these public maps thus formatted appear to have Newtown in District 2.  *See* Doc. 65-2 at 91.

Beyond Mason and Waechter's maps, one and possibly two of the publicly-submitted maps were submitted by Jono Miller, a former Democratic County Commission candidate.  All five publicly-submitted maps resembled each other in setting forth two northern districts, east and west.  Doc. 65-2 at 91; Doc. 77-4 at 2; Doc 77-34 at 112 – 113.

---

[7] The record is not entirely clear, but Waechter testified he hired a lawyer to submit a similar map to the County administration in May, around the time the Board first discussed redistricting.  He said he does not know if County personnel received it. *See* Doc 77-5 at 21 – 24.

The next Board meeting after these submissions was October 7.   Before the meeting Spitzer emailed his county contact Brad Johnson and stated about the publicly-submitted maps:  "I note tha[t] the 'Smith' alternative would (in theory) require the least modification in that it already has three districts with less than a 3% deviation from the mean and no proposed district puts two commissioners in the same district."  Doc. 65-2 at 92.

 Spitzer testified in his deposition that at the October 7 Board meeting the Board was "having a hard time coming to a conclusion, and I just offered that if you took, you know, the Smith map and it only – it had only two districts that were widely disparate, and – but they were equally disparate in population, that you could work with that."  Doc. 77-21 at 202.  Spitzer testified he did not feel the Board was moving towards the Smith map before he made that suggestion.  *Id.* at 202 – 203.  And after his suggestion, Spitzer felt the Board seemed to coalesce around some version of that map.  *Id.*  Spitzer testified that before he made that suggestion that the Smith map was viable with alteration, nobody indicated to him that the Smith map was the one the Board should move forward with.  *Id.* at 203.

At that October 7, 2019 Board Meeting,  the Board instructed Spitzer to update or correct his three maps to resolve the errors and also to validate or equalize the districts in the Smith map, to get it within acceptable tolerances.  Doc. 77 at 4 par. 15.  Spitzer did so with a memo dated October 25, 2019.

Spitzer's memo was provided to the Board prior to the next meeting on October 30, 2019.  This memo contained Spitzer's redone maps with an explanation for their corrections, and the Smith map that Spitzer reworked and validated.  Doc. 77-20 at 145 - 164.  Spitzer's three maps had deviations between 5.06 and 5.58 percentage points.  The repopulated Smith map (now labeled 4.1) had a reported deviation of 6.74 percentage points.

At the October 30,  2019 meeting Spitzer explained the corrections made to his maps.  Doc. 77-33 at 6 - 14.  The Board passed a resolution  to consider adopting the corrected "Smith Map" (labeled 4.1) and one of Spitzer's corrected maps (labeled 2A.1).  Doc. 77-33 at 155 - 156.

 After advertising and notice, on November 19, 2019 the Board deliberated and took public comments.  The County Attorney told them that both maps under consideration were "defensible" but map 4.1 presents different issues than 2A.1.  Doc. 77-34 at 91 – 92.   The County adopted by a 3-2 vote map 4.1, the corrected map originally submitted by Waechter a/k/a Smith.  Doc. 77-25 at 215; Doc. 77-34 at 118 – 119.

Although the record is not clear, the number of citizens in Newtown has generally been stated in this case at roughly 10,000, out of  an updated (Doty estimated) county population of 417,442, Doc. 77-23 at 6, making the Newtown

neighborhood about 2.4% of the county population.   The records that the County

was operating with show that the estimated percentage of African Americans in old

District 1, which included Newtown, was 14.6% and in old District 2 the

percentage of black residents was 2.5%.  Doc. 77-25 at 161.  With the corrected

"Smith map 4.1", the information relied upon by the County shows the percentages

of African American residents in new District 1 was 3.23% and the percent of

African Americans in new District 2, which included Newtown, was 12.43%.

Doc. 77-20 at 157.   Plaintiffs dispute these precise numbers.

E. ANALYSIS:

The undersigned has read every page of this voluminous record.  One searches

the record in vain for actual, trial-admissible evidence that race was *the*

predominant driver of this redistricting.  Plaintiffs rely on inference, which is

insufficient on this record.  *See generally Abbott v. Perez,* 138 S. Ct. 2305 (2018).

Plaintiffs' response to the motion for summary judgment first suggests that

racial block voting exists in north Sarasota County, something that this record does

not support.  Plaintiffs' response and statement of facts state that "Historically,

African-American voters residing in District 1 had tended to vote for African-

American candidates, without regard to a candidate's party."   Doc. 76 at 2; Doc.

77 at 5.   The response then cites two examples of this, which tend to cut the other

way.  First, Mr. Atkins won the 2016 popular vote for District 1 County

Commissioner within District 1, but did not win the election because of

countywide voting.  Doc. 76 at 2.  But District 1 was at least 80% white, Doc. 77-

25 at 161, and Mr. Atkins, an African-American, won that District against his

white opponent, Moran.  This suggests a lack of racial block voting.

   Plaintiffs' responses have twice cited the 2008 vote garnered by black

Republican Carolyn Mason in the Newtown District 1 African-American-

dominated precincts.  Plaintiffs state that Republican commission candidate Mason

carried the Newtown precincts which shows they vote based on race.  Doc. 76 at 2,

citing Doc. 77-4; 77-5 at 85:3-11; *see also* Doc. 77 at 5(asserting Mason's results

in Newtown  show African Americans there vote for African-American

candidates).  But the records cited by Plaintiffs show that Mason, an African-

American Republican, lost in Newtown by a very large margin to her white

Democratic opponent.[8]  Although she lost Newtown badly, Mason won the District

---

[8] The red/blue map filed in this record by Plaintiffs shows that the area of and
surrounding Newtown is blue and went for Mason's white Democratic opponent,
Mr. Miller, in 2008. Doc. 77-4 at 2 (map filed by Plaintiffs). A review of the 2008
election results show that Ms. Mason lost badly the three precincts that primarily
comprised Newtown. In precinct 31 she received 26% of the vote, in precinct 76
she received 25% of the vote and in precinct 153 she received 28% of the vote. The
map which Plaintiffs filed for the Court's consideration at Doc. 77-4 at 2 is a
picture of an interactive map, that originates from the Supervisor of Elections
current web site. *See* Sarasota Cty., Supervisor of Elections,
https://results.enr.clarityelections.com/FL/Sarasota/9825/185229/Web01/en/summ

1 county commission race countywide in 2008 and was reelected without

opposition in 2012.

This suggests that block racial voting in north Sarasota County is not as

portrayed, and there is no other evidence in this record.  This record does not show

that voters in north Sarasota County discern their voting preferences by race;

Mason's results cited by Plaintiffs suggest the opposite.

Moreover, the Supreme Court has cautioned courts not to consider or assume or

stereotype the existence of race block voting.  *See Miller v. Johnson,* 515 U.S. 900,

920, 115 S. Ct. 2475, 2490 (1995)("But where the State assumes from a group of

voters' race that they 'think alike, share the same political interests, and will prefer

the same candidates at the polls,' it engages in racial stereotyping at odds with

equal protection mandates."), citing *Shaw v. Reno,* 509 U.S. 630, 647,  113 S.Ct.

2816, 2827 (1993); *Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 1370

---

ary.html (last visited May 1, 2020). The Court takes judicial notice of this historic
data because Plaintiffs invited it to by including the map.  Further, the 2008
Sarasota County Commissioners District 1 election results found in this map may
be judicially noticed as they are "can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.
201(b)(2); *see Support Working Animals, Inc. v. DeSantis*, No. 4:19CV570-
MW/MAF, 2020 WL 1991479, at *2 (N.D. Fla. Apr. 27, 2020); *Martinez v. Bush*,
234 F. Supp. 2d 1275, 1307 n.36 (S.D. Fla. 2002).

(1991)("We may not accept as a defense to racial discrimination the very stereotype the law condemns.").  As the Supreme Court has held, "We have rejected such perceptions elsewhere as impermissible stereotypes."  *Shaw*, 509 U.S. at 647, 113 S. Ct. at 2827.

Because there is simply no direct, trial-admissible evidence in this record that race was the predominant motive for the county-wide redistricting, Plaintiffs argue inference and circumstantial evidence.  They first point  to the involvement of Republican operative Waechter, a/k/a Adam Smith, a/k/a Agood Citizen.

Waechter is the former head of the Republican party in the county, highly active in partisan politics and a foe of the district-only voting referendum.  Plaintiffs argue that his prior conviction for election fraud, his close ties to incumbent commissioners (especially Moran in District 1) and the nature of his anonymously-provided "Smith map" help show contested issues of fact.   Likewise, Waechter's professed habit of deleting his emails and computer files is offered for an adverse inference.    Waechter was deposed fully in this case, and the Court does not credit or consider his testimony in any way in ruling for Defendant.  However, nothing else in that testimony suggests that Waechter considered race or caused race to be the predominant driver of this redistricting.  The record shows Waechter participated in submitting one additional map with an African-American associate, the Republican former Commissioner Mason.

There is no evidence Waechter spoke to any commissioner about redistricting other than Ziegler who called him to voice opposition. The county staff demographer Ms. Schells testified that Waechter, whom she did not know, called her early on to ask for population data, but nothing was provided to him.  Doc. 77-15 at 6 - 15.  And the staff demographer testified that she did not hear or see anything racial throughout this redistricting process.  Doc. 77-15 at 79.  Likewise, Mr. Johnson, the deputy county administrator responsible for coordinating this process, stated he received the map from Waechter via email, Doc. 77-25 at 114, but did not know him or talk to him.  *Id.* at 13.

Waechter created the original map that was repopulated and corrected by Spitzer at Board direction, which was adopted.  There is simply no record evidence that the main driver of this was skin color, rather than simple political gerrymandering and "hardball" partisan incumbent protection.

Plaintiffs offer the timeframe or calendar as proof of irregularity suggesting a race motive.  In this vein, Plaintiffs assert that the national decennial census will be completed in 2021, and the redistricting was entirely unnecessary, and will have to be redone in two years anyway.  This does not supply proof.

The offending "Smith map" was not considered by the Board on the merits until well after redistricting was underway, and well after Spitzer was hired.   So the act

complained of, redistricting, was well started by the County and underway before the offending map was taken up for consideration by the Board.

Second, county commissioners are instructed by Florida statutes to equalize districts "from time to time" in odd-numbered years. Fla. Stats. 124.01(3). To do so was their prerogative, and the county system for voting had just switched in late 2018 to district-only. The districts were out of line population-wise given the near-decade of growth experienced since 2010. The county staff provided preliminary data showing a close to ten percent deviation. Finalized data by Spitzer and his demographer Doty showed deviation in the old districts to exceed 13%. Doc. 77-33 at 112 -113.

It is also important to note that redistricting county commission borders for incumbent/political gerrymandering, if not driven by race, is not barred by the Fourteenth Amendment Equal Protection Clause and is not barred by any Florida law cited by Plaintiffs. *See. e.g., Rucho v. Common Cause,* 139 S.Ct. 2484 (2019). In other words, the County Commission was free to redraw lines for partisan purposes like protecting allies from opponents, so long as the redistricting did not explicitly discriminate on race, or was unexplainable on grounds other than race. *See id.* at 2496.

Finally, concerning the calendar and timing, it is not clear in this record that the County will be required a do-over, to redistrict in 2021 after the decennial census. Doc. 77-25 at 158 - 159. The Board asked this question of the County Attorney in August, 2019. The Attorney advised the Board in a written opinion that in 2021: "Following the receipt of the 2020 Census, the County Commission is required under the Florida Constitution to review the data and make a determination that the districts are in compliance with the state and federal law. Based on A[ttorney] G[eneral] O[pinion] 74-359, if after a thorough review of the data, the County Commission, in its discretion, determines that the districts are as nearly equal as possible, in light of all the applicable factors, the County Commission is not required to redraw the district boundaries." *Id.*

One other topic Plaintiffs suggest to show irregularity is that Spitzer, who is from Tallahassee, hired a full-time employee of the City of Tallahassee to assist him drawing some of the lines, and Spitzer paid him cash without disclosure. This is offered to suggest an inference of impropriety, but the scant relevance of this is well outweighed by the only really probative piece present in the limited evidence on this subject. In a September 6, 2019 email to this drafter undertaking this task Spitzer said, "BTW…don't worry about where someone might live who might be running in whatever district." Doc. 77-24 at 2.

The record, and Plaintiffs, suggest strongly that a goal of the redistricting was to protect incumbent Republican Commissioner Moran, who was facing Democrat Atkins in the 2020 election for District 1.  Multiple public comments from the commission meetings illustrate this.  Commentators noted that the "Smith map" carved out and removed a former, white, competitive primary opponent of Moran.  Doc. 77-33 at 46 - 47; Doc. 77-34 at 66 - 67.   Others at the public commission meeting suggested the purpose was to benefit Commissioner Moran "and his developer allies,"  *id.* at 47, 72, or to benefit land developers.  *Id. at 87; see also id.* at 40 - 41 (Smith map would "cast out the only candidate currently filed to run" in District 1).[9]

---

[9] *See also* Doc. 77-33 at 45-46; 86 - 87 (to benefit land developers); 71 ("seem to guarantee your election, Mr. Moran"); 90 – 91 ("promoted by both Mike Moran and Nancy Detert….purpose to rig an election in 2020"); Doc. 77-34 at 46 – 47 ("It seems clear that there's one main reason for this exercise: To ensure the reelection of Commissioner Moran in District 1….gerrymander the district so that 4000 more Republicans from Precinct 233 are packed into District 1"); Doc. 77-34 at 10 – 11; 45 – 46; 68 – 70; 72 – 73 ("moving bunches of voters so that an incumbent will be sure to be reelected"); 76 – 77; 85 – 86.

Plaintiffs have cited these unsworn statements in the Amended Complaint as part of the cause of action, and also cite them in Plaintiffs' statement of uncontested facts.  Doc. 9 at 11; Doc. 77 at 12 – 13.  Plaintiffs included them in this record for the Court to consider as part of the pending motion for summary judgment.  Doc. 77-33, Doc. 77-34.  Defendant does not contest their filing here nor their authenticity.  The Court may consider them.  *See Cash Inn of Dade, Inc. v. Metropolitan Dade County,* 938 F.2d 1239, 1242 – 1243 (11th Cir. 1991).

Plaintiff Atkins testified that the entire process was racist and anybody that supported any redistricting map was racially motivated, but "I think the County Commission wanted to adopt redistricting so that they would protect Moran." Doc. 65-4 at p – 10, pp. 47 - 48.   Plaintiff White stated that he did not hear any express racist comments during this event, and the fact that the Board was Republican and Atkins was a Democrat factored into the decision – they did not want him on the Board.  Doc. 65-5.

A further argument that Plaintiffs offer concerning the redistricting is that the numbers employed by Spitzer and his demographer are inaccurate, primarily because they mishandled some of the 11,000 plus census blocks, but also because they miscount minority populations and because the mechanism does not follow the County's instructions.    During this process, a citizen, now utilized by Plaintiff as a lay expert,[10] provided an extensive critique of the numbers, and Spitzer and the

---

10. Mr. R.N. Collins spoke at least twice to the Board, in August and September, and provided extensive materials critiquing the math employed by Doty and Spitzer.  Doc. 77-30 at 4; Doc. 77-39 at 6, 7.  He also communicated to the Board in writing. *E.g.,* Doc. 77-36 at 2.  As noted, Doty and Spitzer resubmitted updated, corrected maps in response to some of these points.

Mr. Collins claims a bachelor's degree in economics from University of South Florida, but is not skilled by education or training in this field of redistricting, and has no significant work experience in the field.  See Doc. 77-39 at 23 – 24.  He appears to be retired from the construction business.  Doc. 77-39 at 24.  The Board heard him out, and was within their presumption of good faith in relying on Spitzer and Doty.  Although Mr. Collins has never testified as an expert at trial or by deposition, and has apparently never been designated before as an expert in

demographer reworked them.  Spitzer and demographer Doty are well-credentialed demographic consultants, who testified they stand by their numbers as modified. *See generally,* Doc. 77-2 at 87 – 137; Doc. 77-20 at 65 – 67; Doc. 77-33 at 6 – 21 (Spitzer explaining the process and methodology to the Board).  The County was well within its perimeter of good faith in accepting this finalized data from this experienced pair and from the County Attorney who informed the Board both submitted maps were defensible.

The main deficiency with Plaintiffs' complaint about the number-crunching is that this is a race discrimination Fourteenth Amendment equal protection case, not a one-person/one-vote case where mathematical population equivalency is a specific element.  Nor is this case brought under the Voting Rights Act, 52 U.S.C. 10301.  Defendant moves for summary judgment on the element of predominant motive.  Here, sufficient contested facts must be shown that race was *the* predominant motive for this redistricting.  The math issues cited by Plaintiffs have very little or nothing to do with the Newtown area and the District 2 border moving east to encompass it.  Critique of the math, as shown by the lay expert proffered by

---

litigation, his report is at Doc. 77-39.   Defendant's recently-filed motion to strike Collins' testimony, Doc. 87, was not ripe at the time the Court entered this Order, and was not considered or consulted because a response was not yet due.

Plaintiffs, Doc. 77-39, does not bear on the sole question here:  is there real, triable, admissible proof to contest that the dominant intent was race?

A frequent touchstone in gerrymander cases is compactness, or contiguity of the districts, because far-flung spiderlike districts may suggest an improper motive for drafting them.  *See Cooper, supra,* 137 S.Ct. at 1473.  Here, the new districts are more compact after redistricting.   The redistricting improved contiguity.  District 2 no longer has a zigzagging panhandle.  District 1 is more square and no longer resembles Oklahoma.  District 4 is more of a solid rectangle, and the fastest growing area, the south county including North Port, Doc. 77-33 at 18, is all encompassed in District 5, and no longer split.  These traits were a roughly similar feature of all the publicly-submitted maps.

Newtown is a neighborhood within the City of Sarasota, and updated District 2 encompasses most of the City proper, much more so than the old district.  This is a natural community of interest, which is also a consideration in redistricting cases.

 Addressing geographic communities of interest, Commissioner Ziegler, a redistricting opponent residing in District 2 who criticized the process, stated in the October 30 Commission meeting that "if the goal is to fundamentally redraw this county  and redraw the districts into geographically, you know, similar areas, then, you know, that [Smith map] is the map."  Doc. 77-33 at 36.  Although he had a

self-interest, Vice Chair Moran stated in support of the adopted map, that now the County has district-only representation, to have a downtown district [District 2], an out-east district [District 1], a Venice district [District 3], a North Port district [District 5], and a mid-county district [District 4] "is an intellectually honest conversation to have in this community."  Doc. 77-33 at 150 - 151.  Ziegler and Moran are correct in that the map as approved does roughly reflect those communities of interest geographically, much more so than the predecessor.

Under the staggered terms required by Florida law, forty percent of the electorate will not vote for county commission until 2022, and this includes some portion of former District 1, including Newtown, that was set to vote in 2020 and changed district numbers.  As the chart above shows, this also happened to a significant portion of Districts 3 and 5 set to vote in 2020, that became new District 4 and now votes in 2022.  Commissioner Maio noticed this issue as it pertains to District 5, and discussed it with the Board.  Doc. 77-33 at 152.   A Democratic precinct captain, speaking at the Board meeting, noted that both maps under final consideration moved some voters to a 2022 voting district.  Doc. 77-34 at 68 – 70. This is an unavoidable consequence of redistricting from a former at-large system when district numbers change for some people and there are staggered terms in single member-only districts.

The Court does not find contested issues of material fact, admissible at trial, that race was the predominant motive for this redistricting.

For the foregoing reasons, the Court grants the County's Motion for Summary Judgment, Doc. 64.  Plaintiffs' Motion for a Permanent Injunction, Doc. 78, is denied as moot.  The Clerk will enter Judgment for the Defendant.

DONE AND ORDERED, this 4th day of May, 2020.

/S/ William F. Jung
William F. Jung
United States District Judge